IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

FILED
U.S. DISTRICT COURT

2006 MAR -8  A II: 21

DISTRICT OF UTAH

BY:_____
DEPUTY CLERK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>     Plaintiff,<br><br><br>          vs.<br><br><br>DAVID A. ECKHART and<br>JUAN M. PEREZ CARDENAS,<br><br>     Defendants. | **REPORT AND RECOMMENDATION**<br><br><br><br>Case No. 2:05-CR-529 DAK |

Before the court is a Motion to Suppress submitted by Defendant, Juan M. Perez Cardenas.  (File Entry #21.)  Defendant seeks to have suppressed items seized and statements made during a traffic stop on June 17-18, 2005.  After thorough review and consideration of the testimony and evidence presented at the evidentiary hearing, the parties' pleadings, and the subsequent oral arguments, the court recommends that Defendant's Motion to Suppress be denied.

### FACTUAL BACKGROUND

On June 17, 2005, at approximately 10:30 p.m., Utah Highway Patrol Trooper Donald Robert Gould was on duty patrolling Interstate 80 in Tooele County near milepost 95.  (Official Transcript of Evidentiary Hearing on Motion to Suppress, held October 25, 2005 (hereafter referred to as "Tr. at __"), at 10.)

Trooper Gould was driving eastbound when he noticed a pickup truck pass him on the left. (Tr. at 11.) As the pickup passed, Trooper Gould was unable to see the occupants or to read the license plate, although he could tell the license plate was from California. (Tr. at 11, 45, 70.) Trooper Gould tried checking the license plate a couple of ways on his computer. First he tried running 4650767, then he tried running 4G50767. (Tr. at 46.) Both versions came back "not on file." (Tr. at 11.)

The pickup was not speeding or committing other traffic violations. (Tr. at 44.) However, because he could not read the pickup's license plate well, Trooper Gould initiated a traffic stop. (Tr. at 12, 47-48.) After he pulled over and shone his spotlight onto the pickup, he could read the plate, California plate 4C50767, and he called that plate number in to his dispatcher. (Tr. at 12, 46, 48.) Trooper Gould also noticed, after he stopped the pickup, that the light on the license plate was not working and that aftermarket metal plates had been bolted on the back bumper. (Tr. at 12, 70.) Trooper Gould opined that the license plate light being out had made it so he could not properly read the license plate before he pulled over the pickup, and that a trailer hitch that slightly stuck up also may have obscured his view of the license plate. (Tr. 71, 75-76.)

Two people occupied the pickup. (Tr. at 13.) Trooper Gould asked the driver for his license and the vehicle registration. (Tr. at 13; Government's Exhibit 1, Videotape of June 17-18, 2005

traffic stop (hereafter referred to as "Video"), at 22:30.)   The
driver provided a Pennsylvania driver's license in the name of
David Eckhart.  (Tr. at 13.)

Trooper Gould noted that as Eckhart handed the license to
Trooper Gould, Eckhart was visibly shaking.  (Tr. at 13-14.)   In
addition, Eckhart was looking straight ahead and seemed to not
want to make eye contact with Trooper Gould.  (Tr. at 13-14.)
Eckhart told Trooper Gould that the pickup belonged to the
passenger.  (Tr. at 13-14.)  The passenger was Defendant.  (Tr.
at 15.)

Defendant told Trooper Gould that the pickup belonged to his
uncle.  (Tr. at 14; Video at 22:31.)  Trooper Gould then asked
Defendant for identification.  (Tr. at 14.)  Defendant gave
Trooper Gould a Washington State identification card.  (Tr. at
14; Video at 22:31.)  The name on the card was Juan Miguel Perez
Cardenas.  (Tr. at 15.)

Trooper Gould asked Eckhart what he was doing with the
pickup, and Eckhart responded that he was going home to
Pennsylvania and that Defendant was going along for a vacation.
(Tr. at 15; Video at 22:31.)  Trooper Gould saw only a small
backpack in the back of the pickup.  (Tr. at 15.)

Trooper Gould told Eckhart that the reason he pulled him
over was because Trooper Gould had not been able to read the back
license plate.  (Video at 22:31-32.)  Trooper Gould testified at
the court that Utah law requires visibility of a license plate at

3

100 feet.  (Tr. at 11, 48.)  Trooper Gould testified to the court that when he stopped the pickup, he did not know what California law required regarding license plate appearance and lighting or regarding trailer hitches.  (Tr. at 45, 76.)

Eckhart and Defendant did not provide Trooper Gould with a vehicle registration.  (Tr. at 16.)  They told Trooper Gould that Defendant's uncle had recently purchased the pickup.  (Video at 22:32.)  They were unable to provide any documentation on the vehicle; they could not provide a bill of sale, proof of insurance, current registration, or a title on the pickup.  (Tr. at 73.)  That fact, coupled with Eckhart's nervousness and the lack of luggage, other than the small backpack, led Trooper Gould to suspect that the truck might be stolen.  (Tr. at 16, 59-60, 73.)  As a result, Trooper Gould decided to separate Eckhart and Defendant and question them separately about the truck.  (Tr. at 16, 59-60, 73.)

Trooper Gould spoke to Eckhart first.  (Tr. at 16.)  He asked Eckhart to step out of the truck and to walk behind it.  (Tr. at 16-17; Video at 22:32.)  Eckhart complied.  (Tr. at 16-17; Video at 22:32.)  Trooper Gould then asked Eckhart if he had purchased the truck, and Eckhart said he had not.  (Tr. at 18; Video at 22:32.)  When Trooper Gould asked Eckhart about his relationship with Defendant, Eckhart said that he had friends in Pennsylvania who were related to Defendant.  (Tr. at 18; Video at 22:32.)  Eckhart told Trooper Gould that he and Defendant were

4

good friends and that Defendant was going to visit Defendant's relatives in Pennsylvania.  (Tr. at 19; Video at 22:33.)

Trooper Gould then asked Eckhart for Defendant's name, and Eckhart said "Juan."  (Tr. at 19; Video at 22:33.)  When Trooper Gould asked for Defendant's last name, Eckhart said he could not remember.  (Tr. at 19; Video at 22:33.)  Eckhart said that he had known Defendant for approximately three years and knew him through Defendant's relatives in Pennsylvania.  (Tr. at 20; Video at 22:33.)

Trooper Gould's dispatcher contacted him to tell him that the truck had not been reported stolen.  (Tr. at 20.)  Trooper Gould was still suspicious because he knew the truck could be stolen but just not listed on the nationwide system.  (Tr. at 20.)  At that point, Trooper Gould had also become suspicious that Eckhart and Defendant were trafficking narcotics.  (Tr. at 20.)

Eckhart told Trooper Gould that he and Defendant had left Fresno that morning.  (Tr. at 21; Video at 22:34.)  Eckhart said that he had flown out to Los Angeles, where he was picked up and taken to Fresno, where he had vacationed for about a week.  (Tr. at 21; Video at 22:34.)

Trooper Gould asked Eckhart where he had stayed in Fresno, and Eckhart said that he had stayed with Defendant.  (Tr. at 21; Video at 22:34.)  Trooper Gould and Eckhart discussed Defendant's relatives in Pennsylvania that Eckhart knew.  (Video at 22:35.)

5

Eckhart said that one relative he knew, who was Defendant's uncle, was named "Jorge," but he did not know Jorge's last name. (Tr. at 22; Video at 22:35.)

Eckhart also told Trooper Gould that he and Defendant had been switching off driving.  (Video at 22:36.)  Eckhart said that they had last stopped at the Flying J in Wells, Nevada, where they had had work done on the alternator.  (Tr. at 22; Video at 22:36.)  Eckhart told Trooper Gould that Defendant's uncle in California had purchased the pickup approximately one week ago. (Video at 22:37.)

Eckhart told Trooper Gould that he had just been laid off. (Tr. at 22; Video at 22:37.)  He said that he used to do landscaping and then he had taken a construction job that had just finished.  (Tr. at 22-23; Video at 22:37.)

As Trooper Gould and Eckhart were standing at the back of the pickup, Eckhart agreed that it was hard to read the license plate.  (Tr. at 23; Video at 22:35.)

Trooper Gould told Eckhart that he was going to see if Defendant had found any more paperwork for the pickup.  (Tr. at 23; Video at 22:39.)  Trooper Gould asked Eckhart to stand about 30 feet in front of the pickup, where the pickup's headlights shone, while he spoke with Defendant.  (Video at 22:39.)

Trooper Gould approached Defendant and asked him to step out of the pickup.  (Tr. at 24; Video at 22:39.)  Trooper Gould then asked Defendant who the pickup belonged to and Defendant

indicated that his uncle had just purchased the pickup "about four days ago." (Tr. at 24; Video at 22:40.)

Defendant told Trooper Gould that Eckhart was going to Pennsylvania to visit Eckhart's dad and that Defendant was going along for the ride. (Tr. at 24-25; Video at 22:40-41.) Defendant told Trooper Gould that he had known Eckhart for a year or two. (Video at 22:41.)

Trooper Gould asked Defendant how he had come into possession of the pickup and Defendant said that Eckhart had asked his uncle if he, Eckhart, could borrow the pickup and drive it back to Pennsylvania. (Tr. at 25; Video at 22:41-42.) Defendant said that his uncle agreed to loan the pickup as long as Defendant went along on the trip. (Tr. at 25; Video at 22:42.)

Trooper Gould then asked Defendant how Eckhart had gotten to Fresno and Defendant said that Eckhart had flown to Los Angeles where Defendant's uncle had picked him up. (Tr. at 25; Video at 22:42.) Trooper Gould asked Defendant if he had any family in Pennsylvania. (Tr. at 26; Video at 22:42.) Initially Defendant said no, but then stated that his uncle's brother lived there. (Tr. at 26; Video at 22:42.)

Defendant told Trooper Gould that he had to be back to work in Fresno on Monday. (Tr. at 26; Video at 22:43.) The stop occurred late Friday night. (Tr. at 26.) When Trooper Gould asked how Defendant was planning to get back, Defendant said he

7

would either drive the pickup back or take a bus.   (Tr. at 26;
Video at 22:43.)   Defendant also told Trooper Gould that he was
not going to see his uncle in Pennsylvania because he did not
have enough time.   (Video at 22:43.)

Trooper Gould asked Defendant if he had been able to locate
registration papers for the pickup and Defendant said that he had
not.   (Tr. at 27; Video at 22:44.)   Trooper Gould then suggested
that the two of them go back to the pickup together to look for
the document.   (Tr. at 27; Video at 22:44.)   When they got to the
pickup, Trooper Gould asked Defendant to look for the
registration.   (Video at 22:44.)   Defendant looked and gave
Trooper Gould a document that Trooper Gould identified as a
notice of delinquent renewal for the pickup.   (Tr. at 27; Video
at 22:44.)

Defendant did not locate registration papers for the pickup.
(Tr. at 27; Video at 22:45.)   Trooper Gould then asked Defendant
for his uncle's phone number and Defendant gave him a number,
(559) 270-2416, and told Trooper Gould that his uncle's name was
"Jose."   (Tr. at 27-28; Video at 22:45.)   Trooper Gould asked
Defendant to continue to look for proof of the pickup's
registration.   (Video at 22:45.)

Trooper Gould's backup, Trooper Croft, then arrived, and
Trooper Gould told Trooper Croft what had been happening.   (Tr.
at 28; Video at 22:45-47.)   Trooper Gould then returned to the
pickup and asked Defendant if he had found proof of the pickup's

8

registration.   (Tr. at 28; Video at 22:48.)   Defendant said that
he had not.   (Video at 22:48.)   Trooper Gould then asked
Defendant why he had a Washington ID card and Defendant said that
he got the card while he was living in Washington State and that
he could not get one in California.   (Tr. at 28; Video at 22:48,
22:49.)   Trooper Gould also asked Defendant if he and Eckhart had
stopped anywhere, and Defendant indicated that they had stopped
at the Flying J in Wells, where they had eaten.   (Tr. at 29;
Video at 22:48.)

      Trooper Gould again asked Defendant if he had any paperwork
for the pickup, including a bill of sale.   (Video at 22:48.)
Trooper Gould asked Defendant if he had been driving on the trip
and Defendant said he had not because he did not have a driver's
license, so Eckhart had been driving the entire time.   (Tr. at
29; Video at 22:49.)

      During the traffic stop, several other officers arrived to
assist Trooper Gould.   After Trooper Croft arrived, Sergeant
Charmin and Deputy Turpin, both of the Tooele County Sheriff's
Department, arrived.   (Tr. at 63-64.)   Later, Lieutenant Mike
Rapich, Trooper Bench, Sergeant Guiterrez, and Trooper Nixon,
along with his drug trained canine, also arrived.   (Tr. at 64-
66.)

      After debriefing another officer who had arrived on the
scene, Trooper Gould returned to talk to Eckhart.   (Tr. at 29;
Video at 22:50.)   Eckhart told Trooper Gould that they had

stopped in Wells for the alternator problem, but said they had not eaten there. (Tr. at 29; Video at 22:50.) Eckhart also told Trooper Gould that Defendant had driven for several hours at the beginning of their trip. (Tr. at 29; Video at 22:51.)

Eckhart did not have a phone number for Defendant's uncle in California. (Video at 22:51.) Eckhart then said that he barely knew Defendant's uncle in California, but he did know the other uncle in Pennsylvania. (Video at 22:51.) Trooper Gould explained to Eckhart his concerns about the pickup's ownership and asked Eckhart to "hang tight." (Video at 22:52.)

Trooper Gould then had a discussion regarding the stop with other officers. The discussion included discussing possible drug indicators and asking for consent to search the pickup. (Video at 22:53-54.)

Trooper Gould again asked Defendant if he had found "a bill of sale or anything like that." (Video at 22:54.) Defendant said no. (Video at 22:54.) Trooper Gould then told Defendant to "sit tight." (Video at 22:54.)

Trooper Gould then spoke with Eckhart and explained that Eckhart's and Defendant's stories did not match up. (Video at 22:54.) Eckhart again told Trooper Gould that the pickup belonged to Defendant's uncle and said that the uncle's name was "Pedro." (Tr. at 30; Video at 22:55.) Eckhart said that he had borrowed the pickup at the uncle's house, but then said that he had gotten the pickup at Defendant's house where the uncle must

10

have left it.   (Tr. at 30; Video at 22:55.)   Eckhart again stated
that he had flown into Los Angeles where Defendant and
Defendant's uncle had met him and then driven him to Fresno.
(Video at 22:55.)

Trooper Gould asked Eckhart how long he had known Defendant,
and Eckhart said for approximately three years.   (Video at
22:56.)   Eckhart then said that he did not know Defendant very
well.   (Video at 22:56.)   Eckhart said that Defendant was going
to visit Defendant's uncle in Pennsylvania.   (Tr. at 30; Video at
22:56.)

Trooper Gould asked Eckhart if there were any drugs or large
amounts of money in the pickup.   Eckhart said, "Not that I know
of."   (Tr. at 31; Video at 22:57.)   He then asked Eckhart if it
was okay if he searched the pickup, and Eckhart said, "I don't
care."   (Tr. at 31; Video at 22:57.)   At the time Trooper Gould
asked for consent, he was the only officer standing beside
Eckhart.   (Tr. at 31; Video at 22:57.)

Trooper Gould then asked Defendant to walk over to where
Trooper Gould was standing.   Trooper Gould asked Defendant his
Pennsylvania uncle's name and Defendant said the name was
"Jorge."   (Tr. at 32; Video at 22:57.)   Defendant said he would
not be visiting Jorge on the trip.   (Tr. at 32; Video at 22:57.)
When asked about the pickup's owner, Defendant said that the
pickup belonged to his uncle in California named "Jose."   (Tr. at
33; Video at 22:57.)

Trooper Gould asked Defendant if there was anything in the truck, including weapons, large amounts of money, and various drugs. (Tr. at 33; Video at 22:58.)   Defendant said not that he knew of.   Trooper Gould then asked, "O.k. if I search the truck?" Defendant said he could.   (Tr. at 33; Video at 22:58.)

After a short search of the pickup, Trooper Gould called for a drug trained canine.   (Tr. at 34; Video at 23:04, 23:06, 23:07.)   The dog arrived approximately twenty minutes later and was deployed on the pickup.   (Tr. at 34; Video at 23:27.)   The handler told Trooper Gould that the dog indicated on two areas on the pickup's exterior.   (Tr. at 34, 66; Video at 23:41.)

The officers then searched the pickup.   (Tr. at 35.)   As part of the search, a red cooler was removed from the truck bed. (Video at 00:04-05.)   Trooper Gould looked at the cooler more closely and noticed that the cooler's inner liner had been separated from the cooler's body.   (Tr. at 35; Video at 00:06.) Further search of the cooler revealed three packages consistent with illegal narcotics.   (Tr. at 35; Video at 00:06-07.)

From the time Trooper Gould asked Eckhart for consent to search the pickup until the dog indicated on the pickup, Eckhart and Defendant neither asked Trooper Gould to stop searching, nor did they indicate they wanted to leave.   (Tr. at 35.)

Trooper Gould had his dispatcher call the phone number Defendant had provided for his uncle who allegedly owned the pickup.   (Tr. at 36.)   The dispatcher reported that she had

12

spoken with someone at that number who said that the pickup had been sold several days before.  (Tr. at 36-37.)

When Trooper Gould first pulled over the pickup, he called in the correct license plate number to his dispatcher.  (Tr. at 46, 48.)  The dispatcher's check indicated that the pickup's license plate number was registered to the pickup.  (Tr. at 46.) (Tr. at 37.)  The registration expired on June 30, 2005, approximately two weeks after the traffic stop at issue in this case, and the pickup was registered to a Davida or Roy Peden in Fresno, California.  (Tr. at 37-38, 47.)  The registration also indicated that the pickup had been transferred on April 23, 2005, to a Gustavo Martinez.  (Tr. at 38.)  Thus, the information presented supports that the pickup was properly registered at the time of the traffic stop. (Tr. at 60.)  In addition, no evidence has been presented confirming Trooper Gould's concern that the pickup was stolen.  (Tr. at 60.)

### PROCEDURAL HISTORY

Defendant was indicted on July 21, 2005.  (File Entry #1.) The case was assigned to United States District Judge Dale A. Kimball, who subsequently referred the case to United States Magistrate Judge Samuel Alba pursuant to 28 U.S.C. § 636(b)(1)(B).  (File Entries #1, 35.)

On September 8, 2005, Defendant filed his Motion to Suppress. (File Entry #21.)  An evidentiary hearing on the motion was held on October 25, 2005.  (File Entry #44.)

13

Defendant then filed a memorandum in support of his Motion to Suppress on November 28, 2005.  (File Entry #48.)   The Government filed its memorandum opposing the Motion to Suppress on December 12, 2005, and a supplemental memorandum on December 13, 2005.  (File Entries #49, 50.)   Defendant filed a reply memorandum to the Government's memorandum on January 13, 2006. (File Entry #55.)

On February 3, 2006, the court held oral arguments.  (File Entry #58; Official Transcript of Oral Arguments on Motion to Suppress, held February 3, 2006 (hereafter referred to as "2-3-06 Hearing at __").)   The court received the transcript of the February 3, 2006 hearing on February 27, 2006, and thereupon took the matter under advisement.

## ANALYSIS

Defendant seeks to have suppressed any evidence seized and statements made during the June 17-18, 2005 traffic stop. Defendant argues that (1) the initial traffic stop was illegal and Trooper Gould impermissibly expanded the scope of the traffic stop; (2) Defendant's statements to officers, including his consent, were not voluntary; and (3) Defendant's statements made during the search were taken in violation of *Miranda v. Arizona*. The Government argues that Defendant does not have standing to object to the pickup's search.  The court first addresses the Government's standing argument.

14

## A.   Standing

"[A] threshold issue in deciding a motion to suppress
evidence is whether the search at issue violated the rights of
the particular defendant who seeks to exclude the evidence."
*United States v. Rascon*, 922 F.2d 584, 586 (10th Cir. 1990),
*cert. denied*, 500 U.S. 926 (1991).  "A district court may not
suppress evidence unless the defendant has met his burden of
proving that he had a personal Fourth Amendment interest that was
implicated by the search."  *Id.*  In this case, the Government
argues that while Defendant has standing to challenge his stop,
detention, and statements made during his stop, he does not have
standing to object to the pickup's search.

To establish that he had a personal Fourth Amendment
interest that was implicated by the search, and thus that he has
standing to object to the pickup's search, Defendant must meet a
two-part test.  Defendant must show (1) that he has manifested a
subjective expectation of privacy in the pickup and its contents
and that (2) that subjective expectation of privacy is one that
society is prepared to recognize as reasonable.  *See United
States v. Hocker*, 333 F.3d 1206, 1208-09 (10th Cir. 2003); *United
States v. Allen*, 235 F.3d 482, 489 (10th Cir. 2000), *cert.
denied*, 532 U.S. 989 (2001); *Rascon*, 922 F.2d at 586; *see also
Rakas v. Illinois*, 439 U.S. 128, 130 n.1 (1978) (affirming that
proponent of motion to suppress bears burden of establishing
standing).  Obviously, Defendant has met the first part of the

15

test by manifesting a subjective expectation of privacy in the pickup and its contents.  Therefore, the court's focus is on whether Defendant's subjective expectation of privacy is reasonable.

To show that his subjective expectation of privacy in the pickup and its contents is reasonable, Defendant must establish that he lawfully possessed the pickup.  *See United States v. Soto*, 988 F.2d 1548, 1552 (10th Cir. 1993); *see also Allen*, 235 F.3d at 489.  Merely possessing the car or its keys does not establish a legitimate possessory interest.  *See Hocker*, 333 F.3d at 1208.  "Rather, at a minimum, the proponent bears the burden of establishing 'that he gained possession from the owner or someone with authority to grant possession.'" *Id.* (quoting *United States v. Arango*, 912 F.2d 441, 445 (10th Cir. 1990), *cert. denied*, 499 U.S. 924 (1991)).

To meet the burden of showing he has a legitimate possessory interest in the vehicle, a defendant "need not always come forward with legal documentation establishing that he lawfully possessed the area searched," but a defendant "must at least state that he gained possession from the owner or someone with the authority to grant possession." *Arango*, 912 F.2d at 445. The defendant's testimony is not required to establish the legality of possession where, as here, an officer testifies as to what the defendant said and what documentation revealed.  *Soto*, 988 F.2d at 1553.

16

In this case, Defendant told Trooper Gould that Defendant's uncle, the pickup's owner, was allowing Eckhart to borrow the pickup only because Defendant was accompanying Eckhart on the trip.  Thus, Defendant told Trooper Gould that Defendant's uncle was the pickup's owner and that Defendant's uncle had given Defendant permission to use the pickup.  Eckhart, who was driving the pickup, also told Trooper Gould that Defendant's uncle owned the pickup and had given Eckhart and Defendant permission to use it to drive to Pennsylvania.

Defendant did not produce documentation proving that his uncle was the pickup's owner, making this a close case.  *Cf. Soto*, 988 F.2d at 1553 (finding that defendant had standing where defendant claimed to have borrowed car from the car's owner and produced a registration bearing that individual's name); *United States v. Rubio-Rivera*, 917 F.2d 1271, 1275 (10th Cir. 1990) (where defendant testified that apparent owner of car loaned him the car and directed him to papers in glove box indicating ownership).  However, the dispatcher's check of the vehicle's registration confirmed that the vehicle was properly registered in California.  In addition, the pickup has not been reported stolen, and the Government has not produced any evidence rebutting Defendant's claim that he had the pickup's owner's permission to use the pickup at the time of the stop.  Therefore, the court concludes that Defendant has met his burden to establish that his expectation of privacy in the pickup and its

17

contents was reasonable, and the court concludes that Defendant
has standing to challenge the search of the pickup and its
contents. *See United States v. Garcia*, 897 F.2d 1413, 1418 (7th
Cir. 1990) (where defendant claimed to have borrowed truck under
vague arrangement, he had standing given that government failed
to disprove that the truck "was not being used with the
permission of the owner") (cited with approval in *Rubio-Rivera*,
917 F.2d at 1275).

The court next turns to Defendant's argument challenging
both the initial stop and the scope of the stop.

### B.   The Stop

The reasonableness of a traffic stop is analyzed under a
two-prong test. *See Terry v. Ohio*, 392 U.S. 1, 20 (1968).
First, the court must determine if the stop was justified at its
inception. Second, the court must determine whether the
detention "was reasonably related in scope to the circumstances
which justified the interference in the first place." *Id.*

First, Defendant challenges the basis for the initial stop.
A traffic stop is justified at its inception if the officer
either observed a traffic or equipment violation or has
reasonable suspicion that such a violation has occurred or is
occurring. *See United States v. Botero-Ospina*, 71 F.3d 783, 787
(10th Cir. 1995), *cert. denied*, 518 U.S. 1007 (1996). An
officer's failure to understand the law he is charged with
enforcing is not objectively reasonable and constitutes an

"impermissible mistake of law." *United States v. Tibbetts*, 396
F.3d 1132, 1137-38 (10th Cir. 2005).

In this case, Officer Gould testified that he could not
properly read the pickup's license plate, in violation of Utah
law, and that is why he pulled over the pickup.  Under Utah law,
license plates are to be maintained in a condition so as to be
"clearly visible."  *See* Utah Code Ann. § 41-1a-404(3)(a)(iii)
(1998); *see also id.* § 41-1a-403 (providing that "[l]icense
plates and the required letters and numerals on them . . . shall
be of sufficient size to be plainly readable from a distance of
100 feet during daylight").  In addition, the license plates are
to be maintained "free from foreign materials" and "in a
condition to be clearly legible."  *Id.* § 41-1a-404(3)(b) (1998).
Even Eckhart acknowledged, after the stop, that the pickup's
license plate was difficult to read.  (Tr. at 23; Video at
22:35.)  Therefore, the traffic stop was justified at its
inception because Officer Gould observed an equipment violation
in that the pickup's license plate was not "clearly legible" and
"clearly visible," in violation of Utah law.

Defendant argues that because Officer Gould was able to read
every character on the license plate except the "C" that this is
a case of a vision problem rather than a license plate violation.
The court disagrees.  Officer Gould made a concerted effort to
read the license plate and ran two possible character
combinations on his computer before pulling over the pickup.

19

Officer Gould should not be punished for making an extra effort to decipher the license plate characters.   Furthermore, as mentioned above, Eckhart admitted the license plate was difficult to read.

Defendant also argues that Officer Gould did not know that the pickup's license plate light was out until after the pickup was stopped, and therefore that cannot be the basis for the initial stop.   Utah law requires that "[e]ither a tail lamp or a separate lamp shall be so constructed and placed as to illuminate with a white light the rear registration plate."   Utah Code Ann. § 41-6a-1604(2)(c) (Supp. 2005).   However, Officer Gould never testified that the reason he pulled over the pickup was because the license plate light was out.   Instead, Officer Gould testified that after he pulled the pickup over, he realized that the light on the pickup's license plate was out.   Officer Gould testified that the light being out definitely contributed to his being unable to read the license plate.   Officer Gould also testified that the trailer hitch may have obstructed his view of the license plate "a little bit."   (Tr. at 70-71, 75-76.)

In addition, Defendant argues that California, rather than Utah, law applies in this case because the pickup was registered in California.   Defendant argues that because California law applies, and because Officer Gould testified he was unfamiliar with California law regarding rear license plate visibility when he pulled over the pickup, the stop was invalid at its inception.

The court disagrees.  The Full Faith and Credit Clause does not preclude a state from enforcing its own vehicle equipment laws. *See United States v. Ramirez*, 86 Fed. Appx. 384, 2004 WL 100525, at *385-86 (10th Cir. 2004) (holding that stop of van, that was registered in Colorado and passing through Utah, by Utah Highway Patrol Trooper, was valid at its inception where trooper stopped van because van's window tinting violated Utah's law regulating window tinting, even though van's window tinting did not violate Colorado's less restrictive law).[1]  In this case, Trooper Gould recognized that the pickup's rear license plate was not properly visible, in violation of Utah law.  Trooper Gould thus observed an equipment violation in Utah and, pursuant to enforcing Utah law, initiated a valid stop under the Fourth Amendment.  *See Botero-Ospina*, 71 F.3d at 787.

Defendant further argues that Utah's license plate laws interfere with the right to interstate travel, under the Privileges and Immunities Clause, and they violate the Dormant Commerce Clause.  The court has carefully reviewed Defendant's brief setting forth these arguments and concludes that they do not alter the court's conclusion.  Defendant's brief does not

---

[1]Although the Tenth Circuit generally disfavors the citation of unpublished decisions, Plaintiff's argument that California license plate laws apply presents a novel legal issue that has not been addressed by the Tenth Circuit in a published decision, and the court finds that *Ramirez* has persuasive value in this case and would assist the court in its disposition.  *See* U.S. Ct. of App. 10th Cir. Rule 36.3.

adequately explain how Utah's license plate laws, under the facts
of the instant case, violate these two constitutional provisions.

In any case, even if Utah's license plate laws are found to
be unconstitutional, the good faith exception to the exclusionary
rule would apply.  Under the good faith exception, the
exclusionary rule does not apply to evidence obtained by police
officers who act in reasonable reliance on validly enacted
statutes.  *See Illinois v. Krull*, 480 U.S. 340, 349-51 (1987);
*United States v. Vanness*, 342 F.3d 1093, 1097-98 (10th Cir.
2003); *Ramirez*, 86 Fed. Appx. 384, 2004 WL 100525, at * n.1.
Thus, under the good faith exception, because it is undisputed
that the pickup's license plate was not completely unobstructed
and "clearly visible," and because Trooper Gould reasonably
relied on Utah's license plate laws, the disputed evidence and
statements would not be excluded even if Utah's laws were found
to be unconstitutional.

Second, Defendant challenges the scope of the stop.  As set
forth above, the second part of the *Terry* analysis is whether the
detention "was reasonably related in scope to the circumstances
which justified the interference in the first place."  *Terry*, 392
U.S. at 20.  With regards to this part of the analysis, the Tenth
Circuit has recognized that "the permissible scope of an
investigatory detention depends on "'the particular facts and
circumstances of each case,'" it must in any case 'last no longer
than is necessary to effectuate the purpose of the stop' and 'be

22

carefully tailored to its underlying justification.'" *United States v. Holt*, 229 F.3d 931, 934 (10th Cir. 2000).  An officer conducting a routine traffic stop may run computer checks on: (1) the driver's license, (2) the vehicle registration, (3) other proof of authorization to operate the vehicle, (4) outstanding warrants on the driver, and (5) whether the vehicle has been reported stolen.  *See United States v. Cervine*, 347 F.3d 865, 871 (10th Cir. 2003); *Holt*, 229 F.3d at 935; *United States v. Mendez*, 118 F.3d 1426, 1429 (10th Cir. 1997); *see also United States v. Taverna*, 348 F.3d 873, 877 (10th Cir. 2003).  An officer may detain the driver and vehicle as long as reasonably necessary to make these determinations or to issue a citation or warning.  *See Mendez*, 118 F.3d at 1429.

Unlike in an ordinary investigative detention, which requires that officers use the least intrusive means in their investigation, *see Florida v. Royer*, 460 U.S. 491, 500 (1983), in an ordinary traffic stop, officers are not required to use the least intrusive means, only reasonable means.  The Tenth Circuit has explained:

> There is no bright-line rule to determine whether the scope of police conduct was reasonably related to the goals of the stop; rather our evaluation is guided by "common sense and ordinary human experience."  We must avoid "unrealistic second-guessing" of police officers' decisions in this regard and thus do not require them to use the least intrusive means in the course of a detention, only reasonable ones.

*United States v. Melendez-Garcia*, 28 F.3d 1046, 1052 (10th Cir.
1994) (internal citations omitted).

Although Eckhart, who was driving the pickup when Officer
Gould pulled it over, was able to produce his driver's license,
neither he nor Defendant could produce the vehicle registration.
In addition, although Eckhart and Defendant told Officer Gould
that the pickup belonged to Defendant's uncle, they could not
produce any documentation proving that they were authorized to
operate the pickup.  As the Government has argued, a driver's
inability to produce some indicia that he is authorized to
operate a vehicle gives rise to an objectively reasonable
suspicion that the vehicle may be stolen.  *See United States v.
Hunnicutt*, 135 F.3d 1345, 1349 (10th Cir. 1998) (stating
inability of driver to produce some indicia of authorization to
operate vehicle gives rise to objectively reasonable suspicion of
illegal activity, justifying further detention); *see also United
States v. Doyle*, 129 F.3d 1372, 1377 (10th Cir. 1997) (finding
agent had reasonable suspicion to continue questioning defendant
and to request permission to search car based on inconsistent
information defendant provided concerning ownership of vehicle);
*United States v. Horn*, 970 F.2d 728, 732 (10th Cir. 1992)
(finding defendant's proffer to suspicious ownership papers and
title in another's name gave rise to reasonable suspicion);
*United States v. Pena*, 920 F.2d 1509, 1514 (10th Cir. 1990)
(stating that driver's claim that car belonged to his brother

24

when it was registered to another justified reasonable
suspicion), *cert. denied*, 501 U.S. 1207 (1991).  Further, Trooper
Gould testified that even after the dispatcher informed him that
the pickup was not listed as stolen, he still was suspicious that
it was stolen because a vehicle can be stolen and not reported as
such.  Thus, from early in the stop, when Eckhart and Defendant
were unable to provide the vehicle registration or proof that
they were entitled to operate the pickup, Trooper Gould developed
reasonable suspicion that the pickup was stolen, allowing him to
expand the scope of the stop.  *See United States v. Villa-
Chaparro*, 115 F.3d 797, 801 (10th Cir.) (quotations omitted) ("An
investigative detention may be expanded beyond its original
purpose . . . if during the initial stop the detaining officer
acquires 'reasonable suspicion' of criminal activity."), *cert.
denied*, 522 U.S. 926 (1997).

Trooper Gould testified that as the stop progressed, he also
became suspicious that Eckhart, Defendant, and the pickup were
involved in drug trafficking.  In assessing whether Trooper Gould
had reasonable suspicion of drug trafficking, the court is not to
base its decision on any one factor, but instead must consider
the "totality of the circumstances." *United States v. Jones*, 44
F.3d 860, 872 (10th Cir. 1995).  It is not appropriate for courts
to "'pigeonhole each purported fact as either consistent with
innocent travel or manifestly suspicious.  Rather, the reasonable
suspicion calculus turns on whether the specific, articulable

facts, when viewed together through the lens of a reasonable law enforcement officer, justified a brief, roadside detention.'" *Doyle*, 129 F.3d at 1376 (citation omitted). Thus, factors that by themselves are not proof of any illegal conduct may be, when taken together in the aggregate, sufficient to amount to reasonable suspicion. *See United States v. Sokolow*, 490 U.S. 1, 9 (1989); *United States v. Arvizu*, 534 U.S. 266, 277 (2002).

Furthermore, deference is to be given "to a trained law enforcement officer's ability to distinguish between innocent and suspicious circumstances." *Mendez*, 118 F.3d at 1431.

> The process does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain common sense conclusions about human behavior; jurors as factfinders are permitted to do the same - and so are law enforcement officers. . . . [T]he evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement. Trained officers aware of the modes and patterns of operation of certain kinds of lawbreakers can draw inferences and make deductions that might well elude untrained persons.

*United States v. Salzano*, 158 F.3d 1107, 1115-16 (10th Cir. 1998) (citing *United States v. Cortez*, 449 U.S. 411, 418 (1981)). Thus, in developing reasonable suspicion, an officer is allowed "to draw on [his] own experience and specialized training to make inferences from and deductions about the cumulative information available to [him] that might well elude an untrained person."

*Arvizu*, 534 U.S. at 273 (citations and quotations omitted).   In

this case, Officer Gould testified that he had been a trooper for

nine years and had received specialized training in pipeline

interdiction.   (Tr. at 9-10.)

Having carefully examined the record, the court concludes

that, in addition to having reasonable suspicion early in the

stop that the pickup was stolen, during the course of the stop,

Trooper Gould was able to develop objectively reasonable

suspicion of drug trafficking based on the totality of the

circumstances.   Several undisputed facts contributed to that

reasonable suspicion.   First, the pickup was registered to a

third party.   *See Villa-Chaparro*, 115 F.3d at 802 (noting fact

that a defendant is driving a car registered to someone else

contributed to reasonable suspicion of criminal activity).

Second, the pickup's bumper appeared to have been altered, making

Trooper Gould suspicious that it could contain a hidden

compartment.   Third, Eckhart was visibly shaking and would not

make eye contact with Trooper Gould during their initial

encounter.   *See United States v. Kopp*, 45 F.3d 1450, 1454 (10th

Cir.) (stating that failure to make eye contact contributed to

reasonable suspicion), *cert. denied*, 514 U.S. 1076 (1995); *Soto*,

988 F.2d at 1554 (stating that "panicky" appearance contributed

to reasonable suspicion).   Fourth, Eckhart claimed that Defendant

was a good friend but did not know his last name.   Then Eckhart

changed his story and said he did not know Defendant that well.

27

Fifth, Eckhart and Defendant's stories were inconsistent: Eckhart said that Defendant had done some of the driving, but Defendant said he had not driven at all; Eckhart said that Defendant and Defendant's uncle had picked him up in Los Angeles and driven him to Fresno, but Defendant said only his uncle had picked up Eckhart in Los Angeles; Eckhart claimed they had stopped in Wells for a mechanical problem, but had not eaten there, while Defendant said they had eaten in Wells; Eckhart and Defendant gave different names for the uncles in California (Defendant said his uncle's name was "Jose", but Eckhart said the uncle's name was "Pedro"); Eckhart said Defendant was visiting family in Pennsylvania, but Defendant said he had no time to do that. *See Hunnicutt*, 135 F.3d at 1349 (stating that inconsistent statements made during traffic stop contribute to formation of an objectively reasonable suspicion of illegal activity); *Kopp*, 45 F.3d at 1454 (same). Sixth, Defendant had implausible travel plans. Defendant was stopped in Utah at 10:30 on a Friday night and said he had to complete the trip to Pennsylvania and then drive back to Fresno, California by Monday. *See Kopp*, 45 F.3d at 1454 (finding implausible explanation regarding travel plan contributed to reasonable suspicion). Seventh, Trooper Gould only saw a small backpack in the pickup and no other luggage. *See Arango*, 912 F.2d at 447 (finding inadequate amount of luggage for alleged trip contributed to reasonable suspicion).

28

In viewing the totality of the circumstances, including the seven facts itemized above, combined with Eckhart and Defendant's inability to provide documentation of the pickup, the court concludes that Trooper Gould had reasonable suspicion that Defendant was engaged in illegal activity. As such, Trooper Gould reasonably detained Defendant and requested consent to search the pickup. *See United States v. Galindo-Gonzales*, 142 F.3d 1217, 1221 (10th Cir. 1998) (an officer may initiate questioning beyond scope of initial traffic violation where he has an objectively reasonable and articulable suspicion of further criminal activity).

In addition, the court concludes that the length of the stop was not unreasonable, in light of Officer Gould's reasonable suspicion of criminal activity, and then of the consent Defendant and Eckhart gave to a search of the pickup. Twenty seven minutes elapsed from the beginning of the stop until the time Officer Gould obtained consent. (2-3-06 Hearing, at 24.) Twenty more minutes elapsed while Officer Gould waited for the drug trained canine to arrive, which was not an unreasonable period of time considering the somewhat remote location of the stop. Further, almost immediately after finding the alleged narcotics, Defendant was arrested. Thus, the court concludes, in light of the totality of the circumstances, that the length of the stop was reasonable.

### C.   Voluntariness of Statements (Including Consent)

Next, Defendant argues that the statements he made during the stop, including his consent to search the pickup, were not voluntarily made.[2]  The Government bears the burden of proof on this issue.  *See Soto,* 988 F.2d at 1557.  In determining the voluntariness of a statement, the court must determine "whether under the totality of the circumstances, the challenged confession was obtained in a manner compatible with the requirements of the Constitution."  *Miller v. Fenton*, 474 U.S. 104, 112 (1985).  To establish voluntariness, the Government must "proffer clear and positive testimony that consent was unequivocal and specific and freely and intelligently given" and "prove that this consent was given without implied or express duress or coercion."  *United States v. McRae*, 81 F.3d 1528, 1537 (10th Cir. 1996) (internal quotations and citation omitted). "Incriminating statements obtained by government acts, threats, or promises that permit the defendant's will to be overborne run afoul of the Fifth Amendment and are inadmissible at trial as evidence of guilt."  *United States v. Glover*, 104 F.3d 1570, 1579 (10th Cir. 1997).

---

[2]Defendant also argues that his consent to search the pickup was invalid because it was insufficiently attenuated from the taint of an illegal detention.  However, because the court concludes that Defendant's stop and detention were legal, the court rejects this argument.

Although Defendant was stopped at night and separated from his traveling companion, Trooper Gould did not coerce Defendant. As evidenced by the Video, Trooper Gould consistently used a normal, friendly tone with Defendant and made no threats. Trooper Gould did not touch Defendant or draw his weapon. Although the stop occurred in a somewhat remote location, it occurred on a public highway where traffic passed by, as evidenced by the Video.  Although other officers came to assist Trooper Gould, it appears no other officers questioned Defendant. When Trooper Gould asked Defendant for consent to search the pickup, Defendant was sitting in the pickup and no other officers were standing with Trooper Gould.  No officer threatened Defendant during the course of the stop.

Thus, in light of the totality of the circumstances, the court concludes that the evidence in this case shows that Defendant's statements, including his consent, were freely and voluntarily given during the stop.

### D.  *Miranda*

Defendant argues that his statements to Trooper Gould during the traffic stop should be suppressed because he was not advised of his *Miranda* rights.  *See Miranda v. Arizona*, 384 U.S. 436 (1966).

*Miranda* "warnings are simply not implicated in the context of a valid *Terry* stop" unless the stop was effected using a level of force more associated with formal arrest than with the typical

traffic stop.  *United States v. Perdue*, 8 F.3d 1455, 1464 (10th
Cir. 1993).

In the instant case, there was no such heightened level of
force employed by Trooper Gould.  During the stop, Trooper Gould
did not use weapons or handcuffs.  Rather, the encounter between
Trooper Gould and Defendant consisted of an amount of force that
was minimal and normally associated with a routine traffic stop.
*See United States v. Raynor*, 108 Fed Appx. 609, 613-14 (10th Cir.
2004) ("[E]ven though the Defendants were not free to leave, the
level of force used to effectuate the stop was not so intrusive
as to transform an investigative detention into a custodial
interrogation that would require *Miranda* warnings.").  While
there were other officers present at the scene, Officer Gould was
the main officer who interacted with Defendant, and Officer Gould
spoke to Defendant in a nonthreatening, friendly way.  No
evidence has been presented supporting that the other officers at
the scene used weapons or handcuffs prior to Defendant's arrest,
or that they employed a greater level of force more associated
with a formal arrest than with a typical traffic stop.  Thus,
under the circumstances of this case, *Miranda* warnings were not
required.

32

## RECOMMENDATION

Based on the foregoing analysis, **IT IS HEREBY RECOMMENDED** that Defendant's motion to suppress evidence seized during the search of Defendant's vehicle (File Entry #21) be **DENIED**.

Copies of the foregoing report and recommendation are being mailed to the parties who are hereby notified of their right to object to the same.  The parties are further notified that they must file any objections to the report and recommendation, with the clerk of the district court, pursuant to 28 U.S.C. § 636(b), within ten (10) days after receiving it.  Failure to file objections to both factual and legal findings may constitute a waiver of those objections on subsequent appellate review.

DATED this ___ day of March, 2006.

BY THE COURT:


Samuel Alba
United States Chief Magistrate Judge

33